## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## SAN ANGELO DIVISION

| | | |
|---|---|---|
| **JACK MILLER, individually, and** | § | |
| **o/b/o his minor son, D.M.,** | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 6:20-cv-131** |
| | § | |
| **MICHAEL WEBBER,** | § | |
| **TREY MAYBERRY,** | § | |
| **RAYMOND FRANCIS, and** | § | |
| **SAN ANGELO, TEXAS** | § | |
| *Defendants.* | § | |

### PLAINTIFF'S FIRST AMENDED COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, Jack Miller, individually, and o/b/o his minor son, D.M., complaining of Michael Webber, Trey Mayberry, Raymond Francis, and San Angelo, Texas, and for causes of action will respectfully show unto the Court as follows:

> "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."

*Terry v. Ohio*, 392 U.S. 1, 9 (1968).

## SUMMARY

On October 4, 2020, Officers Michael Webber, Trey Mayberry, and Raymond Francis of the San Angelo Police Department wrongfully and illegally arrested Jack Miller in front of his three-year-old son, D.M., even though Mr. Miller had committed no crime. Officers Mayberry and Francis approached Mr. Miller inside of a Walmart based on an erroneous call that a man with a child was intoxicated. Upon making contact with Mr. Miller, these officers concluded that Mr. Miller was not intoxicated and had committed no crime. However, in an act taken straight from a dystopian police state, the officers demanded that Mr. Miller identify himself before he was free to go about his day. Officer Webber even went as far as threatening to call Child Protective Services to take Mr. Miller's son, if Mr. Miller did not comply with their illegal demands to identify himself.

Mr. Miller did not become aggressive or combative, but simply asked why he needed to identify himself if he was not under arrest for anything – which is precisely what the law dictates. In response, Officers Webber, Mayberry, and Francis illegally arrested Mr. Miller in front of his three-year-old son without probable cause that any crime had been committed. D.M. immediately began crying in fear for his father, as these officers called Mr. Miller a "dumbass" and assaulted Mr. Miller by unnecessarily pinning his neck against the top edge of a cooler and raising his handcuffed wrists behind his back until they injured his rotator cuff in his shoulder. Officers Mayberry and Francis then walked Mr. Miller outside to be placed in a police car, as Mr. Miller's frightened and distraught three-year-old son remained with Officer Webber, one of the men he had just watched assault his father.

In response to this incident, their supervisor, Sgt. Brian Holt told the officers that, "it happens," referring to arresting people without probable cause. **Sgt. Holt admitted**

**there had been confusion regarding the crime of Failure to Identify as long as he had been with San Angelo Police Department. Sgt. Holt then admitted that he has seen people get charged for Failure to Identify on consensual contacts, despite this being illegal.** Sgt. Holt has been with the San Angelo Police Department since June 16, 1998 – over twenty years. This means that San Angelo Police officers have been illegally arresting people for failing to identify themselves despite no authority requiring that they do so for over twenty years.

Mr. Miller now files this lawsuit against Officers Webber, Mayberry, and Francis for violating his constitutional rights under the Fourth Amendment to the United States Constitution to be free from unreasonable seizures, falsely imprisoning him, and assaulting him, and for inflicting needless and damaging emotional distress on his three-year-old son, D.M., who is now scared to go to the store because he believes his father will be taken away by the police. Mr. Miller also files this lawsuit against San Angelo, Texas for maintaining an unconstitutional practice of arresting people without probable cause and for maintaining unconstitutional training policies regarding when and who could be arrested for the offense of Failure to Identify, which lead to the violation of Mr. Miller's constitutional rights in this case.

## I.
## PARTIES

1.      Plaintiff Jack Miller is a resident of Tom Green County, Texas.

2.      Defendant Michael Webber, is an individual residing in San Angelo, Tom Green County, Texas and is a police officer with the City of San Angelo Police Department and may be served at his place of employment at the San Angelo Police Department

located at 401 E Beauregard Ave, San Angelo, TX 76903 or wherever he may be found. Defendant Webber is being sued in his individual capacity.

3.      Defendant Trey Mayberry, is an individual residing in San Angelo, Tom Green County, Texas and is a police officer with the City of San Angelo Police Department and may be served at his place of employment at the San Angelo Police Department located at 401 E Beauregard Ave, San Angelo, TX 76903 or wherever he may be found. Defendant Mayberry is being sued in his individual capacity.

4.      Defendant Raymond Francis, is an individual residing in San Angelo, Tom Green County, Texas and is a police officer with the City of San Angelo Police Department and may be served at his place of employment at the San Angelo Police Department located at 401 E Beauregard Ave, San Angelo, TX 76903 or wherever he may be found. Defendant Francis is being sued in his individual capacity.

5.      Defendant San Angelo, Texas is a political subdivision of the State of Texas located in the Northern District of Texas. Defendant San Angelo, Texas can be served through its City Manager, Daniel Valenzuela, at City Hall, fourth floor, 72 W. College Ave., San Angelo, TX 76903, or wherever he may be found.

**II.**
**JURISDICTION AND VENUE**

6.      The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.

7.      Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391 because the Defendants reside in the Northern District of Texas and all of the causes of action accrued in the Northern District of Texas.

### III.
### FACTS AND ALLEGATIONS

1.      At all times relevant to the subject matter of this litigation, Defendant San Angelo, Texas (hereinafter referred to as "San Angelo" or "City") operated the San Angelo Police Department.

2.      At all times relevant to the subject matter of this litigation, Defendant Michael Webber (hereinafter referred to as "Defendant Webber") was an employee of the City, working for the San Angelo Police Department, and who was following the City's policies, practices, customs, and training.

3.      At all times relevant to the subject matter of this litigation, Defendant Trey Mayberry (hereinafter referred to as "Defendant Mayberry") was an employee of the City, working for the San Angelo Police Department, and who was following the City's policies, practices, customs, and training.

4.      At all times relevant to the subject matter of this litigation, Defendant Raymond Francis (hereinafter referred to as "Defendant Francis") was an employee of the City, working for the San Angelo Police Department, and who was following the City's policies, practices, customs, and training.

5.      On October 4, 2020, Defendant Officers Webber, Mayberry, and Francis of the San Angelo Police Department approached Jack Miller as he was shopping at Walmart with his three-year-old son, D.M.

6.      The interaction between Mr. Miller and Defendants Webber, Mayberry, and Francis was recorded on Defendant Mayberry's body worn camera.[1]

---

[1] Defendant Mayberry's body worn camera video is attached as Exhibit A and fully incorporated herein.

7.     Mr. Miller was about to check out with his groceries when Defendants Mayberry and Francis first approached him.

8.     Mr. Miller's three-year-old son, D.M., was sitting in the shopping cart along with Mr. Miller's groceries.

9.     Defendant Mayberry asked Mr. Miller if he had been drinking and explained that there was a reported call of an intoxicated driver with a child in the parking lot.

10.     Mr. Miller responded that he had not had anything to drink.

11.     Defendant Mayberry asked Mr. Miller if he knew anything about the report.

12.     Mr. Miller explained a woman honked at him in the parking lot as he was trying to park and he told her that she could not drive, but that nothing more happened.

13.     It was obvious to Defendants Mayberry and Francis that Mr. Miller had not been drinking alcohol and was not intoxicated as the original report claimed – as they told Sgt. Brian Holt later that day that Mr. Miller was not intoxicated.

14.     After speaking with Mr. Miller and determining that he was not intoxicated, Defendant Francis asked Mr. Miller for his name.

15.     Mr. Miller responded, "Jack," which is his first name.

16.     Defendant Francis asked Mr. Miller if he had his identification so that Defendant Francis could verify Mr. Miller's identity.

17.     Mr. Miller responded that he had identification but that he did not have to give the Defendant Officers his identification.

18.     Defendant Mayberry then told Mr. Miller, "I don't think you understand what this is – this is not you get to tell us what is what."

19.     Defendant Mayberry told Mr. Miller, "we are trying to identify who you are and you are making that difficult."

20.     Actually, what Mr. Miller was doing was attempting to go shopping with his son without having government agents force him to produce identification to verify his identity.

21.     Mr. Miller calmly stated that he did not have to turn over his identification, which is exactly what the law states.

22.     Defendant Mayberry again asked Mr. Miller for his ID, stating "just to verify who you are."

23.     Defendant Francis told Mr. Miller, "I want to verify who you are so you can go about your day and we can go about our day and we will be done."

24.     Defendant Webber then approached and asked if Mr. Miller was failing to ID.

25.     Defendant Francis told Defendant Webber that Mr. Miller was failing to ID.

26.     Defendant Webber then told Mr. Miller, "unless you identify yourself with this legal investigation you are going to be arrested for failure to ID."

27.     Mr. Miller attempted to respond, but Defendant Webber raised his voice at Mr. Miller stating, "listen to me!"

28.     Defendant Webber then told Mr. Miller, "and then, we're going to call CPS [Child Protective Services] to come pick up your kid."

29.     Defendant Webber was threatening to have Mr. Miller's three-year-old son, who was sitting within earshot in the grocery cart directly next to Mr. Miller, taken away from him if he did not identify who he was, despite the fact that Mr. Miller had not committed any crime and was not under arrest.

30.     Mr. Miller asked Defendant Webber if he was threatening to take his son.

31.     Defendant Webber again interrupted Mr. Miller.

32.    Mr. Miller asked if he was allowed to talk.

33.    Defendant Webber told Mr. Miller, "you have one thing to respond with right now and that's to identify yourself."

34.    Again, Mr. Miller had not violated any laws and the Defendants had no probable cause that he had committed any crime – as Defendants Francis and Mayberry told Sgt. Holt later that day that they did not have probable cause that Mr. Miller had committed any crimes.

35.    Mr. Miller tried explaining to Defendant Webber that, "failure to identify is when you have been lawfully arrested."

36.    Defendant Webber then stated that Mr. Miller was being arrested.

37.    The handcuffing and use of force that is about to be outlined occurred within feet of Mr. Miller's three-year-old son, D.M.

38.    D.M. watched in horror as the Defendants grabbed, pushed, and shoved his father.

39.    Defendants Webber, Mayberry, and Francis all grabbed Mr. Miller.

40.    Defendants Webber, Mayberry, and Francis turned Mr. Miller around so that they had access to his hands to handcuff him behind his back.

41.    Mr. Miller did not resist the officers and complied with their instructions.

42.    Mr. Miller stated, "My kid is right there."

43.    Defendant Webber told Mr. Miller, "turn around and put your hands behind your back," even though Mr. Miller had already turned around and his hands were behind his back.

44.    Mr. Miller stated that his hands were behind his back.

45.    D.M., began to cry as the Defendants appeared to be hurting his father.

46.     Mr. Miller calmly stated, "look what you're doing man" as his son was crying next to them.

47.     Mr. Miller tried to calm his son down by stating, "baby it's ok."

48.     Defendant Francis used his forearm to push Mr. Miller's face and neck up against shelving next to them, which was unnecessary as Mr. Miller was not resisting and Defendant Webber was placing the handcuffs onto Mr. Miller's hands, which were both behind his back.

49.     When Defendant Francis pushed Mr. Miller's face and neck against the shelving unit it caused Mr. Miller pain and he can be heard groaning in pain.

50.     D.M. watched this happen.

51.     Mr. Miller calmly asked, "what are you doing?"

52.     Defendant Webber stated, "you've been placed under arrest for failure to ID."

53.     Defendant Webber then stated over his radio, "we have one resisting" even though Mr. Miller was clearly not resisting arrest as he was standing against the shelving unit with his hands behind his back as handcuffs were being put on him.

54.     Mr. Miller continued trying to calm down his son.

55.     After securing Mr. Miller in handcuffs, Defendant Webber called Mr. Miller a "dumbass."

56.     Mr. Miller responded, "dumbass? Are you kidding me?"

57.     Defendants Webber, Mayberry, and Francis then pushed the handcuffed and non-resistant Mr. Miller into a large drink cooler.

58.     Defendant Webber told Mr. Miller to "calm down" even though Mr. Miller had been calm the entire time the Defendants had been assaulting and falsely arresting him directly in front of his three-year-old son.

59.     Defendant Mayberry was holding Mr. Miller's handcuffed wrists behind his back and forcing him against the drink cooler.

60.     Defendant Webber had ahold of the back of Mr. Miller's head and was forcing his neck against the top edge of the drink cooler.

61.     Defendant Francis had ahold of Mr. Miller's right shoulder and the top of Mr. Miller's head and was helping force Mr. Miller against the drink cooler.

62.     Mr. Miller could be heard groaning in pain as the Defendants had him pressed up against the cooler and Defendant Webber was forcing his neck against the top edge of the cooler.

63.     Defendant Webber was choking Mr. Miller by forcing his neck against the top edge of the cooler.

64.     Mr. Miller was not resisting, was handcuffed with his hands behind his back, had been calm the entire time, and was not attempting to escape or evade arrest as his three-year-old child was there with him.

65.     Defendant Webber then asked Mr. Miller if he was going to identify himself.

66.     Mr. Miller stated he would give them his identification.

67.     Defendant Webber stated, "it's a little late for that isn't it."

68.     Mr. Miller stated he was just now under arrest.

69.     Defendant Webber had ahold of Mr. Miller's left arm, which was pulled behind his back in handcuffs.

70.     Defendant Francis had ahold of Mr. Miller's right arm, which was pulled behind his back in handcuffs.

71.     Defendant Mayberry had ahold of Mr. Miller's hands, which were behind his back in handcuffs.

72.     All three Defendants raised Mr. Miller's arms upward and behind his back causing his shoulders pain and injuring his rotator cuff.

73.     During an internal investigation into this incident, Defendant Francis admitted that he pulled Mr. Miller's arms up to cause him pain. Defendant Francis referred to this action as "pain compliance."

74.     During the internal investigation into this incident, Defendant Webber admitted he was aware that if you have someone's hands behind their back and you forcibly push their arms above their shoulder blades, you could possibly pop their arms out of socket.

75.     When all three Defendants raised Mr. Miller's arms causing him pain in his shoulders, Mr. Miller was not resisting, attempting to flee, or a threat, as he was handcuffed with his hands behind his back, being held by three officers who were all larger than him, had a calm demeanor which he had the entire time, and had his three-year-old son present and watching.

76.     All three Defendants held Mr. Miller in the position with his arms handcuffed and lifted behind his back even though it was unnecessary as he was calm, compliant, and restrained.

77.     Mr. Miller was asking the Defendants where his son was as they held him in the painful position.

78.    On December 1, 2020, Detective Rodney Black called Defendant Mayberry and asked him if he completed a Use of Force Report for the incident. Defendant Mayberry advised he had not because he did not do anything but put cuffs on him. Detective Black informed Defendant Mayberry that he should go watch the video because **there were some things that would require a report**.

79.    This demonstrates that Detective Black believed there was more force used than Defendant Mayberry was admitting.

80.    On December 1, 2020 Detective Black called Defendant Webber and asked him if he completed a Use of Force Report. Defendant Webber advised he did not write one. Defendant Webber advised he did not do anything to cause pain like wristlocks. Defendant Webber said all they did was hold onto him until they could get him handcuffed. Detective Black advised Defendant Webber **he should watch his video and do a report**.

81.    This demonstrates that Detective Black believed there was more force used than Defendant Webber was admitting.

82.    Defendants Mayberry and Francis walked the handcuffed Mr. Miller out of the Walmart and to a police car outside.

83.    As they passed D.M., Mr. Miller told his son that it would be okay.

84.    D.M. was scared while he was forced to wait inside of the Walmart with Defendant Webber, after just having watched Defendant Webber assault his father.

85.    Defendant Mayberry placed the handcuffed Mr. Miller into the back of a police car.

86.     Sgt. Brian Holt arrived and Mr. Miller explained to him that he had been arrested for failing to identify himself even though he was not under arrest at the time his identification was requested.

87.     Sgt. Holt asked Defendants Mayberry and Francis what happened.

88.     Defendants Mayberry and Francis confirmed that Mr. Miller was not under arrest when he was asked to identify himself or when he refused to do so.

89.     After discussing with Sgt. Holt, Defendants Mayberry and Francis told Sgt. Holt that they did not have probable cause that Mr. Miller had committed any crime.

90.     Sgt. Holt directed Defendants Mayberry and Francis to release Mr. Miller.

91.     Once Mr. Miller was released from the police car and had the handcuffs taken off of him, he went to get his son.

92.     Since this incident, D.M. has been terrified to go to the store, because he believes the police will show up and take his father away.

93.     D.M. used to enjoy playing "cops and robbers" where he would be the police officer trying to catch the "bad guys;" however, since this incident, D.M. has not wanted to play "cops and robbers" anymore and if he does, he now wants to be the robber as he is scared of the police.

94.     This fear and mental anguish that three-year-old D.M. was experiencing, and continues to experience, was directly caused by being feet away and watching as the Defendants detained his father in handcuffs, assaulted him against the shelves and cooler, and then took him away.

95.     At all times relevant to this lawsuit, Defendants Webber, Mayberry, and Francis were acting under color of law and pursuant to the policies, practices, and training of the City.

## **Failure to train officers on the law resulted in Constitutional violations**

96.     Following the false arrest of Mr. Miller, Sergeant Brian Holt told Defendants Webber and Francis that, "it happens."

97.     Upon information and belief, Sergeant Holt was stating that false arrests for failure to identify happen.

98.     Sergeant Holt then stated there had been confusion regarding Failure to Identify as long as he had been at the San Angelo Police Department.

99.     Sergeant Holt stated that he has seen people get charged for Failure to Identify on *consensual contacts* with police officers.

100.    A *consensual contact* involves no form of detainment or even reasonable suspicion – let alone probable cause – that a crime has been committed, is being committed, or is going to be committed.

101.    During the internal investigation into this incident, Defendant Francis stated that when they were attempting to get Mr. Miller to identify himself, he was treating the interaction with Mr. Miller as a *consensual contact*.

102.    During the internal investigation into this incident, Defendant Mayberry stated that the interaction with Mr. Miller was a *consensual contact*.

103.    During the internal investigation into this incident, Defendant Webber stated he believed the interaction with Mr. Miller was a detention.

104.    None of the officers believed Mr. Miller was under arrest at the time he refused to identify himself.

105.    The fact that San Angelo police officers have initiated a consensual encounter with a citizen, asked for their identification, and then arrested them and had them charged with a crime for failing to provide their identification during the consensual

encounter is beyond frightening and is directly attributable to San Angelo and Defendant Chief of Police Frank Carter's failures to train and supervise its officers.

106.    The fact that there had been confusion regarding Failure to Identify as long as Sergeant Holt had been at the San Angelo Police Department, shows that this was not simply Defendants Webber, Mayberry, or Francis not knowing the law – but that it was a department wide issue stemming from the inadequate training being given to San Angelo police officers.

107.    The fact that Sergeant Holt has seen people get charged for Failure to Identify on consensual contacts with police officers, shows that this was not simply a one-off issue with Defendants Webber, Mayberry, or Francis falsely arresting Mr. Miller – but that it was a department wide issue stemming from the inadequate training being given to San Angelo police officers.

108.    During an internal investigation into this incident, Defendant Francis stated that it was his understanding of the law that if someone was being detained, they could not refuse to give their name. Defendant Francis stated that if it was a legal detention the person had to identify themselves.

109.    Sergeant Travis Griffith corrected Defendant Francis on the law and explained that a person had to be arrested to force them to give their name.

110.    Defendant Francis continued to be confused over the specifics of the law.

111.    During the internal investigation into this incident, Defendant Webber agreed with Detective Rodney Black when Detective Black stated that he believed Defendant Webber thought if someone was being detained, they had to identify themselves.

112.    In a letter from Defendant Clark to Defendant Francis regarding the false arrest of Mr. Miller, Defendant Clark stated, "Clearly, the suspect was not under arrest at the time he refused to identify himself to you and as a result, your actions to arrest him for a violation of Texas Penal Code 38.02 was a misapplication of law resulting in an unlawful arrest of the suspect."

113.    Following the internal investigation into this incident, Detective Black concluded that Defendants Webber, Mayberry, and Francis' misunderstanding of the Failure to Identify Statute led to an unlawful seizure of Miller by placing him under arrest and that **their misunderstanding of the Failure to Identify Statute led to the unlawful seizure**.

114.    The internal investigation following this false arrest of Mr. Miller sustained Knowledge of Laws allegations against Defendants Francis, Webber, and Mayberry.

115.    Following the internal investigation into this incident, Defendant Carter required a mandatory department wide training related to the application of Texas Penal Code 38.02 "Failure to Identify".

116.    It is clear that San Angelo and Defendant Clark's failure to adequately train San Angelo Police Officers on when it is appropriate to arrest someone for violating Texas Penal Code 38.02 lead to the Constitutional violations in this case based off

(1) Following the false arrest of Mr. Miller, Sergeant Brian Holt told Defendants Webber and Francis that, "**it happens**".

(2) The fact that **there has been confusion regarding Failure to Identify as long as Sergeant Holt had been at the San Angelo Police Department**,

(3) Sergeant Holt's witnessing **multiple people being arrested and charged for failing to identify during _consensual encounters_**,

(4) Defendants Webber, Mayberry, and Francis all not knowing and correctly applying the law at the time of Mr. Miller's false arrest,

(5) Defendant Francis believing that if someone was being detained, they could not refuse to give their name and that if it was a legal detention the person had to identify themselves,

(6) Defendant Webber believing that if someone was being detained, they had to identify themselves,

(7) In a letter from Defendant Clark to Defendant Francis regarding the false arrest of Mr. Miller, Defendant Clark stated, "**Clearly, the suspect was not under arrest at the time he refused to identify himself to you and as a result, your actions to arrest him for a violation of Texas Penal Code 38.02 was a misapplication of law resulting in an unlawful arrest of the suspect**,"

(8) Following the internal investigation into this incident, Detective Black concluded that **Defendants Webber, Mayberry, and Francis' misunderstanding of the Failure to Identify Statute led to an unlawful seizure of Miller by placing him under arrest** and that **their misunderstanding of the Failure to Identify Statute led to the unlawful seizure**, and

(9) Following the internal investigation into this incident, Defendant Carter required a **mandatory department wide training** related to the application of Texas Penal Code 38.02 "Failure to Identify".

117.     Based off Sgt. Holt's admission, upon information and belief, discovery into information within the knowledge of the City will show that there are more instances of people being arrested for Failure to Identify despite San Angelo Police Officers not having probable cause that these arrestees violated the Failure to Identify law.

118.     At all times relevant to this lawsuit, Defendants Webber, Mayberry, and Francis were acting under color of law.

**IV.**
**CAUSES OF ACTION**

**Count One**

**Unlawful Arrest**
**Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983**
**Against Defendants Webber, Mayberry, and Francis**

119.     Mr. Miller repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

120.     No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. *Terry v. Ohio*, 392 U.S. 1, 9 (1968).

121.     Defendants Webber, Mayberry, and Francis deprived Plaintiff of his constitutionally protected right to be free from unreasonable seizures under the Fourth Amendment by unlawfully arresting him despite lacking probable that any crime had been committed as he was not under arrest at the time he was asked and then refused to identify himself and had committed crime.

122.   A false arrest claim under 42 U.S.C. § 1983 requires a showing of (1) willful detention, (2) without consent, (3) without authority of law, and (4) the deprivation of a constitutional right.

123.   There is no cause of action for false arrest under § 1983 unless the arresting officer lacked probable cause.

124.   There can be no doubt that the right not to be arrested absent probable cause was clearly established at the time of Mr. Miller's arrest. *Alexander v. City of Round Rock*, 854 F.3d 298, 306–07 (5th Cir. 2017).

125.   Fifth Circuit case law also clearly establishes that police officers lack actual or arguable probable cause to arrest a person for failure to identify, in violation of Texas law, when the person has not yet been arrested at the time that he fails to provide officers with identification, because the "failure to identify" offense is triggered only when a person who has already been arrested fails to provide identification upon an officer's request. *Davidson v. City of Stafford, Texas*, 848 F.3d 384, 392 (5th Cir. 2017).

126.   To determine the presence or absence of probable cause, the totality of the circumstances surrounding the arrest must be considered.

127.   Defendants Webber, Mayberry, and Francis intentionally arrested Mr. Miller by restraining him in handcuffs and later confining him in the back of a police car, without a warrant, without his consent, and without any legal justification.

128.   Mr. Miller did not consent to his restraint or confinement and was conscious of both.

129.   Defendants Webber, Mayberry, and Francis willfully arrested Plaintiff by telling Plaintiff he was being arrested and by restraining Plaintiff in handcuffs and later in a patrol vehicle.

130.    Mr. Miller did not consent to being restrained in handcuffs or to being restrained in the patrol vehicle.

131.    Defendants Webber, Mayberry, and Francis did not have probable cause to support arresting Mr. Miller as they did not see Mr. Miller commit a crime, and he was not under arrest at the time he refused to identify himself; thus, the "failure to identify" offense under § 38.02 was not triggered since it applies only when an officer "has lawfully arrested the person and requested the information." TEX. PENAL CODE § 38.02(a); *Davidson*, 848 F.3d at 392.

132.    Additionally, Defendants Mayberry and Francis admitted to Sgt. Brian Holt that they did not have probable cause to arrest Mr. Miller for any other crime.

133.    Defendants Webber, Mayberry, and Francis did not have authority of law to arrest Mr. Miller as they did not have a warrant or probable cause to arrest him, and no other exigent circumstances existed justifying his arrest.

134.    By knowingly and intentionally arresting Mr. Miller without consent, without probable cause, and without legal justification, Defendants Webber, Mayberry, and Francis deprived Mr. Miller of his Fourth Amendment right to be free from unreasonable seizures.

135.    As a result of the illegal arrest, Mr. Miller suffered injuries.

136.    As a result of the illegal arrest, Defendants Webber, Mayberry, and Francis deprived Mr. Miller of his civil, constitutional and statutory rights and are liable to Mr. Miller pursuant to 42 U.S.C. § 1983.

137.    Mr. Miller was damaged as a result of Defendants Webber, Mayberry, and Francis' wrongful acts as his liberty was deprived and he suffered the emotional distress and mental anguish of seeing his son cry out in fear.

138.    Additionally, when making the illegal arrest, Defendants Webber, Mayberry, and Francis injured Mr. Miller's rotator cuff, causing him physical pain and suffering.

## Count Two

### Excessive Force
### Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983
### Against Defendants Webber, Mayberry, and Francis

139.    Mr. Miller repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

140.    Acting under the color of law, Defendants Webber, Mayberry, and Francis deprived Mr. Miller of the rights and privileges secured to him by the Fourth and Fourteenth Amendments to the United States Constitution and by other laws of the United States to be free from illegal and unreasonable seizures by the use of force.

141.    Mr. Miller brings this cause of action pursuant to 42 U.S.C. § 1983.

142.    The amount of force used by Defendants Webber, Mayberry, and Francis against Mr. Miller as described above, specifically but not limited to, when Defendants Webber, Mayberry, and Francis slammed the already handcuffed Mr. Miller against the drink cooler, Defendants Webber and Francis pressed his head and neck against the top edge of the cooler, and then Defendants Webber, Mayberry, and Francis raised his arms up behind his back and held him in that position until his rotator cuff was injured, was objectively unreasonable under the circumstances and inflicted unnecessary injury, pain, and suffering upon Plaintiff.

143.    A seizure is unreasonable if it results in (a) an injury, (b) that resulted directly and only from a use of force that was clearly excessive, and (c) the excessiveness was clearly unreasonable.

144.    Although officers may need to use "physical force ... to effectuate [a] suspect's compliance" when he refuses to comply with commands during a traffic stop, the officers still must assess "the relationship between the need and the amount of force used." *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012); quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009).

145.    Where an individual's conduct amounts to mere "passive resistance," use of force is not justified. *Trammell v. Fruge*, 868 F.3d 332, 341 (5th Cir. 2017).

*146.*    A constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest. *Darden v. City of Fort Worth, Texas,* 880 F.3d 722, 731 (5th Cir.*), cert. denied sub nom. City of Fort Worth, Tex. v. Darden,* 139 S. Ct. 69, 202 L. Ed. 2d 23 (2018).

147.    Fifth Circuit case law makes clear that when an arrestee is not actively resisting arrest the degree of force an officer can employ is reduced. *Id.*

148.    Mr. Miller was not suspected of committing a felony offense when Defendants Webber, Mayberry, and Francis slammed him against the drink cooler, when Defendants Webber and Francis pressed Mr. Miller's head and neck against the top edge of the cooler, or when Defendants Webber, Mayberry, and Francis injured his rotator cuff by raising his arms up behind his back and holding him in that position.

149.    Mr. Miller was only suspected of committing a minor offense for failure to identify, which he had not even committed.

150.    Mr. Miller was not attempting to flee, as his three-year-old son was with him, he was in handcuffs being held by three officers, and he was calm and compliant the entire time.

151.   Mr. Miller was not threatening any officer or other person immediately prior to when Defendants Webber, Mayberry, and Francis slammed him against the drink cooler, when Defendants Webber and Francis pressed Mr. Miller's head and neck against the top edge of the cooler, or when Defendants Webber, Mayberry, and Francis injured his rotator cuff by raising his arms up behind his back and holding him in that position.

152.   Mr. Miller was not resisting arrest prior to when Defendants Webber, Mayberry, and Francis slammed him against the drink cooler, when Defendants Webber and Francis pressed Mr. Miller's head and neck against the top edge of the cooler, or when Defendants Webber, Mayberry, and Francis injured his rotator cuff by raising his arms up behind his back and holding him in that position – as he had complied with the Defendants by turning around and putting his hands behind his back to be handcuffed and then took a couple of steps with the Defendants before they slammed him against the cooler for no reason.

153.   A reasonable officer would know that the use of force is <u>clearly excessive</u> when engaging with citizens such as Mr. Miller, who was not threatening any officer or other person, was only suspected of committing the misdemeanor crime of failing to identify himself (which he had clearly not committed), was not attempting to flee, was not resisting arrest, and who the use of force was not warranted.

154.   A reasonable officer would know that the use of force is <u>clearly unreasonable</u> when engaging with citizens such as Mr. Miller, who was not threatening any officer or other person, was only suspected of committing the misdemeanor crime of failing to identify himself (which he had clearly not committed), was not attempting to flee, was not resisting arrest, and who the use of force was not warranted.

155.    A reasonable officer in Defendants Webber, Mayberry, or Francis' shoes would know that slammed a person against a drink cooler, pressing their neck against the top edge of the cooler, and then raising their arms up behind their back and holding them in that position until their rotator cuff was injured, when that person was not threatening any officer or other person, was only suspected of committing the misdemeanor crime of failing to identify, was not attempting to flee, was not actively resisting arrest is clearly unreasonable and excessive.

156.    As a direct result of the force used against him by Defendants Webber, Mayberry, and Francis, Mr. Miller has suffered physical injury, pain and mental anguish for which he sues herein.

157.    These injuries were not caused by any other means.

## Count Three

### PRACTICE AND CUSTOM OF DELIBERATE INDIFFERENCE
### *Monell v. New York City Department of Social Services*
### Violation of the Fourth Amendment
### Pursuant to 42 U.S.C § 1983
### Defendant San Angelo, Texas

158.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

159.    Municipalities, including counties and cities, may be held liable under § 1983. *Hampton Co. Nat'l Sur., LLC v. Tunica Cty.*, 543 F.3d 221, 224 (5th Cir. 2008).

160.    A municipality may be liable under § 1983 if the execution of one of its customs or policies deprives a plaintiff of his or her constitutional rights. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978).

161.    Municipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal

approval. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 690–91).

162.    "Under the decisions of the Supreme Court and [the Fifth Circuit], municipal liability under section 1983 requires proof of three elements: a policy maker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694).

163.    The plaintiff may demonstrate a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Zarnow*, 614 F.3d at 168–69 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984).

164.    A municipality "cannot be liable for an unwritten custom unless '[a]ctual or constructive knowledge of such custom' is attributable to a city policymaker." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (citing *Hicks–Fields*, 860 F.3d at 808.

165.    To establish municipal liability under § 1983 based on an alleged "persistent widespread practice or custom that is so common it could be said to represent municipal policy, actual or constructive knowledge of such practice or custom must be shown." *Malone v. City of Fort Worth*, 297 F. Supp. 3d 645, 654 (N.D. Tex. 2018) (citing *Hicks–Fields*, 860 F.3d at 808).

166.    "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities…" *Hicks–Fields v. Harris Cty.*, 860 F.3d 803, 808 (5th Cir. 2017)).

167.    The § 1983 causation component requires that the plaintiff identify, with particularity, the policies or practices they allege cause the constitutional violation, and demonstrate a "direct causal link." *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 255 (5th Cir. 2018); See *Piotrowski v. City of Houston*, 237 F.3d 567, 580 (5th Cir. 2001). The Fifth Circuit does not, however, require the court to consider each policy or practice in a vacuum. *Id.* The court may properly consider how individual policies or practices interact with one another within the larger system and how the harmful effects of some policies are exacerbated by others. *Id.*

168.    The Supreme Court has described an actionable *Monell* policy as "a course of action consciously chosen among various alternatives." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S. Ct. 2427, 2436, 85 L. Ed. 2d 791 (1985).

### City's Policymakers with Regard to the Police Department were the City Council and the Police Chief

169.    The identification of policymaking officials is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

170.    Because the "specific identity of the policymaker is a legal question that need not be pled," plaintiffs can state a claim for municipal liability as long as they plead sufficient facts to allow the court to reasonably infer that the Board either adopted a policy that caused M.L.'s injury or delegated to a subordinate officer the authority to adopt such a policy. *Longoria Next Friend of M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 271 (5th Cir. 2019); quoting *Groden v. City of Dallas*, 826 F.3d 280, 284, 286 (5th Cir. 2016).

171.    In other words, plaintiffs must plead facts that sufficiently connect the policymaker [...] to the allegedly unconstitutional policy [...]. *Id.*

172.    Here, the City Council is the policymaker for the City of San Angelo who is responsible for the policies of the San Angelo Police Department.

173.    The City Council had constructive knowledge of the City's customs, practices, and *de facto* policies regarding arresting people without probable cause that the crime of Failure to Identify had been committed and failing to adequately train officers on when someone can be arrested for the crime of Failure to Identify, as they would have known of the violations if they would have properly exercised their responsibilities..." following the unlawful arrests dating back over twenty years, as referenced by Sgt. Holt. *Hicks–Fields*, 860 F.3d at 808.

174.    Alternatively, the City Council, as policymaker for the City, delegated policymaking authority to promulgate, adopt, approve, or ratify the *de facto* policies regarding arresting people without probable cause that the crime of Failure to Identify had been committed and failing to adequately train officers on when someone can be arrested for the crime of Failure to Identify, to the Police Chief Deputy for the San Angelo Police Department. *Longoria Next Friend of M.L.*, 942 F.3d at 271; quoting *Groden*, 826 F.3d at 284, 286.

<u>**City's Practice of Arresting People**</u>
<u>**Without Probable Cause for the Offense of Failure to Identify**</u>

175.    The City, under the direct supervision of the City's policymakers – the City Council and the Chief of Police, maintained, implemented, encouraged, and ratified the following unconstitutional policies and practices, with deliberate indifference to the constitutional violations that they were directly causing and would continue to directly cause, such as the illegal arrest of Mr. Miller by Defendants Webber, Mayberry, and Francis in this case:

a. Arresting people for the criminal offense of Failure to Identify despite lacking probable cause that the arrestees committed the offense of Failure to Identify

b. Failing to adequately train the City's police officers on the law regarding the criminal offense of Failure to Identify so that the officers will understand when they have probable cause that a person has committed the offense of Failure to Identify and when a person can and when a person cannot be arrested for the criminal offense of Failure to Identify, despite knowing that this lack of training will result in unconstitutional and illegal arrests such as Mr. Miller's in this case and the previous arrests referred to by Sgt. Holt.

### City's Failure to Train Regarding
### Requirements for an Arrest for Failure to Identify

176.    To plead a plausible failure-to-train claim, a plaintiff must allege sufficient facts to show: "(1) the training procedures were inadequate; (2) the [city's] policymaker was deliberately indifferent in adopting the training policy; and (3) the inadequate training policy directly caused [the plaintiff's] injury." *Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011).

177.    The City's training procedure was inadequate when it came to training the City's police officers on the law regarding the criminal offense of Failure to Identify so that the officers will understand when they have probable cause that a person has committed the offense of Failure to Identify and when a person can and when a person cannot be arrested for the criminal offense of Failure to Identify, despite knowing that this lack of training will result in unconstitutional and illegal arrests such as Mr. Miller's in this case and the previous arrests referred to by Sgt. Holt.

178.    The City, under the direct supervision of the City's policymakers – the City Council and the Chief of Police, maintained, implemented, encouraged, and ratified the unconstitutionally inadequate training regarding when and who can be arrested for the offense of Failure to Identify, with deliberate indifference to the constitutional violations that they were directly causing and would continue to directly cause, such as the illegal arrest of Mr. Miller by Defendants Webber, Mayberry, and Francis in this case and the previous arrests referred to by Sgt. Holt.

179.    The City's inadequate training policy regarding when and who can be arrested for the offense of Failure to Identify, directly caused the illegal arrest of Mr. Miller by Defendants Webber, Mayberry, and Francis in this case as they were not properly trained on when they could arrest for Failure to Identify and as a result arrested Mr. Miller when he refused to identify himself prior to actually being arrested, which is not probable cause to arrest someone for the offense of Failure to Identify

## Facts Supporting *Monell* Claims Against the City

180.    Following the false arrest of Mr. Miller, Sergeant Brian Holt told Defendants Webber and Francis that, "it happens."

181.    Upon information and belief, Sergeant Holt was stating that false arrests for failure to identify happen.

182.    Sergeant Holt then stated there had been confusion regarding Failure to Identify as long as he had been at the San Angelo Police Department.

183.    Sergeant Holt stated that he has seen people get charged for Failure to Identify on *consensual contacts* with police officers.

184.   A *consensual contact* involves no form of detainment or even reasonable suspicion – let alone probable cause – that a crime has been committed, is being committed, or is going to be committed.

185.   During the internal investigation into this incident, Defendant Francis stated that when they were attempting to get Mr. Miller to identify himself, he was treating the interaction with Mr. Miller as a *consensual contact*.

186.   During the internal investigation into this incident, Defendant Mayberry stated that the interaction with Mr. Miller was a *consensual contact*.

187.   During the internal investigation into this incident, Defendant Webber stated he believed the interaction with Mr. Miller was a detention.

188.   None of the officers believed Mr. Miller was under arrest at the time he refused to identify himself.

189.   The fact that San Angelo police officers have initiated a consensual encounter with a citizen, asked for their identification, and then arrested them and had them charged with a crime for failing to provide their identification during the consensual encounter is beyond frightening and is directly attributable to San Angelo and Defendant Chief of Police Frank Carter's failures to train and supervise its officers.

190.   The fact that there had been confusion regarding Failure to Identify as long as Sergeant Holt had been at the San Angelo Police Department, shows that this was not simply Defendants Webber, Mayberry, or Francis not knowing the law – but that it was a department wide issue stemming from the inadequate training being given to San Angelo police officers.

191.   The fact that Sergeant Holt has seen people get charged for Failure to Identify on consensual contacts with police officers, shows that this was not simply a one-

off issue with Defendants Webber, Mayberry, or Francis falsely arresting Mr. Miller – but that it was a department wide issue stemming from the inadequate training being given to San Angelo police officers.

192.    During an internal investigation into this incident, Defendant Francis stated that it was his understanding of the law that if someone was being detained, they could not refuse to give their name. Defendant Francis stated that if it was a legal detention the person had to identify themselves.

193.    Sergeant Travis Griffith corrected Defendant Francis on the law and explained that a person had to be arrested to force them to give their name.

194.    Defendant Francis continued to be confused over the specifics of the law.

195.    During the internal investigation into this incident, Defendant Webber agreed with Detective Rodney Black when Detective Black stated that he believed Defendant Webber thought if someone was being detained, they had to identify themselves.

196.    In a letter from Defendant Clark to Defendant Francis regarding the false arrest of Mr. Miller, Defendant Clark stated, "Clearly, the suspect was not under arrest at the time he refused to identify himself to you and as a result, your actions to arrest him for a violation of Texas Penal Code 38.02 was a misapplication of law resulting in an unlawful arrest of the suspect."

197.    Following the internal investigation into this incident, Detective Black concluded that Defendants Webber, Mayberry, and Francis' misunderstanding of the Failure to Identify Statute led to an unlawful seizure of Miller by placing him under arrest and that **their misunderstanding of the Failure to Identify Statute led to the unlawful seizure**.

198.    The internal investigation following this false arrest of Mr. Miller sustained Knowledge of Laws allegations against Defendants Francis, Webber, and Mayberry.

199.    Following the internal investigation into this incident, Defendant Carter required a mandatory department wide training related to the application of Texas Penal Code 38.02 "Failure to Identify".

200.    It is clear that San Angelo and Defendant Clark's failure to adequately train San Angelo Police Officers on when it is appropriate to arrest someone for violating Texas Penal Code 38.02 lead to the Constitutional violations in this case based off

(1) Following the false arrest of Mr. Miller, Sergeant Brian Holt told Defendants Webber and Francis that, "**it happens**".

(2) The fact that **there has been confusion regarding Failure to Identify as long as Sergeant Holt had been at the San Angelo Police Department**,

(3) Sergeant Holt's witnessing **multiple people being arrested and charged for failing to identify during *consensual encounters***,

(4) Defendants Webber, Mayberry, and Francis all not knowing and correctly applying the law at the time of Mr. Miller's false arrest,

(5) Defendant Francis believing that if someone was being detained, they could not refuse to give their name and that if it was a legal detention the person had to identify themselves,

(6) Defendant Webber believing that if someone was being detained, they had to identify themselves,

(7) In a letter from Defendant Clark to Defendant Francis regarding the false arrest of Mr. Miller, Defendant Clark stated, "**Clearly, the suspect was not**

under arrest at the time he refused to identify himself to you and as a result, your actions to arrest him for a violation of Texas Penal Code 38.02 was a misapplication of law resulting in an unlawful arrest of the suspect,"

(8) Following the internal investigation into this incident, Detective Black concluded that **Defendants Webber, Mayberry, and Francis' misunderstanding of the Failure to Identify Statute led to an unlawful seizure of Miller by placing him under arrest** and that **their misunderstanding of the Failure to Identify Statute led to the unlawful seizure**, and

(9) Following the internal investigation into this incident, Defendant Carter required a **mandatory department wide training** related to the application of Texas Penal Code 38.02 "Failure to Identify".

201.   Based off Sgt. Holt's admission, upon information and belief, discovery into information within the knowledge of the City will show that there are more instances of people being arrested for Failure to Identify despite San Angelo Police Officers not having probable cause that these arrestees violated the Failure to Identify law.

202.   Mr. Miller's injuries were not caused by any other means.

**Count Four**

**False Imprisonment**
**Texas State Law Cause of Action**
**Against Defendants Webber, Mayberry, and Francis**

203.   Mr. Miller repeats and re-alleges each and every allegation contained in the above paragraph, incorporates those allegations in this Count, and further alleges as follows:

204.   The elements of false imprisonment under Texas state law are: (1) willful detention by the Defendant; (2) without consent; and (3) without authority of law.

205.   Defendants Webber, Mayberry, and Francis willfully detained Mr. Miller by imprisoning him when they restrained him in handcuffs and placed him in a patrol car.

206.   Mr. Miller did not consent to being imprisoned, being restrained in handcuffs, or being placed in the patrol car.

207.   Defendants Webber, Mayberry, and Francis did not have authority of law to imprison Mr. Miller as they did not have a warrant or probable cause to arrest him, and no other exigent circumstances existed justifying his arrest.

208.   Defendants Webber, Mayberry, and Francis did not have probable cause to support arresting Mr. Miller as they did not see Mr. Miller commit a crime, and he was not under arrest at the time he refused to identify himself; thus, the "failure to identify" offense under § 38.02 was not triggered since it applies only when an officer "has lawfully arrested the person and requested the information." TEX. PENAL CODE § 38.02(a); *Davidson*, 848 F.3d at 392.

209.   Additionally, Defendants Mayberry and Francis admitted to Sgt. Brian Holt that they did not have probable cause to arrest Mr. Miller for any other crime.

210.   There was no justification for Defendants Webber, Mayberry, or Francis' actions.

211.   These actions constitute the tort of false imprisonment under the laws of the state of Texas.

## Count Five

### Assault
### Texas State Law Cause of Action
### Against Defendants Webber, Mayberry, and Francis

212.    Mr. Miller repeats and re-alleges each and every allegation contained in the above paragraph, incorporates those allegations in this Count, and further alleges as follows:

### Slamming and Pressing Mr. Miller Against the Cooler

213.    Defendants Webber, Mayberry, and Francis, as described above, slammed and pressed Mr. Miller into a cooler, and in doing so, intentionally, knowingly, or recklessly caused bodily injury to Mr. Miller.

214.    Defendants Webber, Mayberry, and Francis, as described above, slammed and pressed Mr. Miller into a cooler, and in doing so, intentionally or knowingly threatened Mr. Miller with imminent bodily injury.

215.    Defendants Webber, Mayberry, and Francis, as described above, slammed and pressed Mr. Miller into a cooler, and in doing so, intentionally or knowingly caused physical contact with Mr. Miller when Defendants Webber, Mayberry, and Francis knew or should reasonably have believed that Mr. Miller would regard the contact as offensive or provocative.

### Choking Mr. Miller

216.    Defendants Webber and Francis, as described above, pressed Mr. Miller's head and neck against the top edge of the cooler choking him, and in doing so, intentionally, knowingly, or recklessly caused bodily injury to Mr. Miller.

217.     Defendants Webber and Francis, as described above, pressed Mr. Miller's head and neck against the top edge of the cooler choking him, and in doing so, intentionally or knowingly threatened Mr. Miller with imminent bodily injury.

218.     Defendants Webber and Francis, as described above, pressed Mr. Miller's head and neck against the top edge of the cooler choking him, and in doing so, intentionally or knowingly caused physical contact with Mr. Miller when Defendants Webber and Francis knew or should reasonably have believed that Mr. Miller would regard the contact as offensive or provocative.

### Raising Mr. Miller's Arms to Injure His Shoulder

219.     Defendants Webber, Mayberry, and Francis, as described above, injured Mr. Miller's rotator cuff by raising Mr. Miller's arms up behind his back and holding him in that position, and in doing so, intentionally, knowingly, or recklessly caused bodily injury to Mr. Miller.

220.     Defendants Webber, Mayberry, and Francis, as described above, injured Mr. Miller's rotator cuff by raising Mr. Miller's arms up behind his back and holding him in that position, and in doing so, intentionally or knowingly threatened Mr. Miller with imminent bodily injury.

221.     Defendants Webber, Mayberry, and Francis, as described above, injured Mr. Miller's rotator cuff by raising Mr. Miller's arms up behind his back and holding him in that position, and in doing so, intentionally or knowingly caused physical contact with Mr. Miller when Defendants Webber, Mayberry, and Francis knew or should reasonably have believed that Mr. Miller would regard the contact as offensive or provocative.

222.     There was no justification for Defendants Webber, Mayberry, or Francis' actions.

223.   These actions constitute the tort of assault under the laws of the state of Texas.

## Count Six

### Bystander Recovery
### Texas State Law Cause of Action
### Against Defendants Webber, Mayberry, and Francis

224.   Mr. Miller, on behalf of D.M., repeats and re-alleges each and every allegation contained in the above paragraphs, incorporates those allegations in this Count, and further alleges as follows:

225.   To recover as a bystander, a plaintiff is required to establish that: (1) the plaintiff was located near the scene of the accident, as contrasted with one who was a distance away from it; (2) the plaintiff suffered shock as a result of a direct emotional impact upon the plaintiff from a sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence; and (3) the plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship. *United Servs. Auto. Ass'n v. Keith*, 970 S.W.2d 540, 541–42 (Tex. 1998).

226.   D.M. was located at the scene where the Defendants falsely imprisoned and assaulted his father, as D.M. was only feet away in the shopping cart and watched the entire incident transpire before his three-year-old eyes.

227.   D.M. suffered a direct emotional impact from his sensory and contemporaneous observance, as he watched the Defendants assault and falsely imprison his father from only feet away and he started to cry immediately upon witnessing the Defendants' actions as they occurred.

228.   D.M. continues to suffer severe mental anguish as he is now scared to go shopping due to his fear, which was caused by this incident, that the police will take his father away and hurt him.

229.   D.M. is closely related to the victim of the false arrest and assaults, Mr. Miller, as D.M. is Mr. Miller's son.

## V.
## PUNITIVE DAMAGES

230.   Mr. Miller, individually and on behalf of D.M., repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

231.   When viewed objectively from the standpoint of Defendants Webber, Mayberry, and Francis, at the time of the occurrence, said Defendants' conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

232.   As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by Defendants Webber, Mayberry, and Francis, which was recklessly or callously indifferent to Mr. Miller's and D.M.'s protected rights, Mr. Miller, individually and on behalf of D.M., is entitled to recover punitive damages in an amount within the jurisdictional limits of this Court.

## VI.
## DAMAGES

233.   Mr. Miller, individually and on behalf of D.M., repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

234.   Victims of unreasonable searches and seizures may recover damages directly related to the invasion of their privacy. *Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999).

235.   Mr. Miller's injuries were a foreseeable event. Those injuries were directly and proximately caused by the illegal arrest and false imprisonment of Mr. Miller and the assault and excessive force used against Mr. Miller, which occurred in the presence of D.M.

236.   Mr. Miller's injuries were a foreseeable event as they were directly and proximately caused by the City's deliberately indifferent practices and training regarding when and who to arrest for the criminal offense of Failure to Identify, which led to the illegal arrest and false imprisonment of Mr. Miller, which occurred in the presence of D.M.

237.   D.M.'s injuries were a foreseeable event as they were directly and proximately caused by the direct emotional impact from his sensory and contemporaneous observance of the Defendants assaulting and falsely imprisoning his father only feet away from him and the obvious sensitivity he would have to such a violent situation given his age and relationship to Mr. Miller.

238.   As a result, Mr. Miller and D.M. are entitled to recover all actual damages allowed by law. Mr. Miller, individually and on behalf of D.M., contends each of the Individual Defendants' conduct constitutes malice, evil intent, or reckless or callous indifference to Mr. Miller's and D.M.'s legally protected rights. Thus, Mr. Miller, individually and on behalf of D.M., is entitled to punitive damages against Defendants Webber, Mayberry, and Francis.

239.   As a direct and proximate result of the occurrence which made the basis of this lawsuit, Mr. Miller was forced to suffer:

    a.   Emotional distress, torment, and mental anguish in the past and future;

    b.   Physical injuries;

    c.   Physical pain and suffering; and

    d.   Deprivations of his liberty.

240.   As a direct and proximate result of the occurrence which made the basis of this lawsuit, D.M. was forced to suffer:

    a.   Emotional distress, torment, and mental anguish in the past and future;

241.   Pursuant to 42 U.S.C. § 1983 and § 1988, and Texas Civil Practice & Remedies Code section 41.003(a), Plaintiff seeks to recover, and hereby requests the award of punitive damages, reasonable attorney's fees, and costs of court.

## VII.
## <u>ATTORNEY'S FEES</u>

242.   If Mr. Miller prevails in this action on his claims pursuant to 42 U.S.C. § 1983, by settlement or otherwise, Mr. Miller is entitled to and hereby demands attorney's fees under 42 U.S.C. § 1988.

## VIII.
## <u>JURY REQUEST</u>

243.   Mr. Miller, individually and on behalf of D.M., respectfully requests a jury trial.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Mr. Miller, individually and on behalf of D.M., prays that judgment be rendered against Defendants, for an amount in excess of the jurisdictional minimum of this Court. Mr. Miller, individually and on behalf of D.M., further prays for all other relief, both legal and equitable, to which he may show himself justly entitled.

Respectfully submitted,

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Texas Bar No. 00797196

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com

COUNSEL FOR PLAINTIFF